Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 07-cv-00540-RPM-CBS

--------------------------------------------------

DEPOSITION OF FREDERICK M. ANTHONY

--------------------------------------------------

FREDERICK M. ANTHONY,

                    Plaintiff,

vs.

EDWARD J. WALSH,
GARY LEV,
MICHAEL WALSH,
WILD HORSE INVESTMENT PARTNERS, LLC, a Colorado limited
liability company,

                    Defendants.

--------------------------------------------------

Wednesday, November 28, 2007

9:23 a.m.

PURSUANT TO Notice and the Federal Rules of Civil
Procedure, the above-entitled deposition was taken on
behalf of Defendants at 370 17th Street, Suite 4650,
Denver, Colorado, before K. Michelle Dittmer, Registered
Merit Reporter and Notary Public within Colorado.

EXHIBIT
A-1
Blumberg No. 5208

a4ff1021-a17b-4f89-8edf-0b4a921ce12a

Frederick Anthony v. Edward Walsh, et al.                    FREDERICK ANTHONY November 28, 2007

Page 27

1        A     He simply said that they're looking to

2   replace the general manager that they just fired, would

3   I be interested in it, and if so, he gave me the

4   information to contact Ed Walsh.

5              Actually, it wasn't Ed Walsh, it was

6   another guy who was -- there's a fellow by the name of

7   Don something, who was working for Ed, trying to find

8   candidates for that position.

9        Q     Okay.  Do you remember what time period

10  this was that you would have tendered a -- did you send

11  in this resume, Exhibit 28, to someone?

12       A     Yeah.  I emailed it to Don.

13       Q     Okay.

14       A     And that would have been, timewise, around

15  the end of June, beginning of July.

16       Q     Okay.

17       A     Of '04.

18       Q     Okay.  And do you recall what the response

19  was to your submission of the resume?

20       A     I was asked to interview with Ed, Mike, and

21  Gary in Las Vegas.

22       Q     Do you recall how long between the

23  submission of the resume and the time you were asked for

24  an interview, how long that was?

25       A     I don't recall.  It was three or four weeks

Local          Pelton Reporting Service, Inc.          Denver
(719) 578-2062 peltonreporting@comcast.net (303) 575-6606
a4ff1021-a17b-4f89-8edf-0b4a921ce12a

Frederick Anthony v. Edward Walsh, et al.          FREDERICK ANTHONY November 28, 2007

Page 28

1    maybe.

2          Q   Okay.  And so you were asked to interview

3    with them.  Do you recall when you first interviewed

4    with any of them?

5          A   The date?

6          Q   The date or the circumstances.

7          A   The only thing I recall is meeting with

8    them.  It was on a Saturday.

9          Q   It was on a Saturday?

10         A   Yeah.

11         Q   And it was in Las Vegas?

12         A   Correct.

13         Q   At the Mandalay Bay?

14         A   Yeah.  It started out at the Howard

15   Johnson's, which was a decrepit little place, and Ed was

16   embarrassed by it.

17         Q   Is that where someone was staying?

18         A   No.  I think they flew in to meet there.  I

19   don't know who was staying there, I don't know who would

20   want to stay there, but --

21         Q   Okay.

22         A   Anyway, I said, Oh, okay, that's where

23   you're going to meet.

24             So I went down there and I met with Ed and

25   he said -- you know, we met in the parking lot and he

Frederick Anthony v. Edward Walsh, et al.          FREDERICK ANTHONY November 28, 2007

Page 29

1    said, You know, this place is really kind of nasty.  He

2    said, Let's go to Mandalay Bay.

3            So we drove in my car, both Gary and Ed and

4    I, to Mandalay Bay.

5            Q    Okay.  You, Gary and Ed were the only ones

6    in the car?

7            A    Correct.

8            Q    Did you meet anyone else at Mandalay Bay?

9            A    Mike.

10           Q    Okay.  And did you go to someone's room?

11   You mentioned you first met Mike in a hotel room, and

12   I'm just trying to --

13           A    We went to Mike's room.

14           Q    Okay.

15           A    It was the only available place to have the

16   interview.

17           Q    Okay.  And that was the first time you met

18   him?

19           A    Correct, first time for meeting all of

20   them.

21           Q    That all occurred on the same day?

22           A    Correct.

23           Q    And it would have been June or July when

24   you submitted your resume, and September 14 when you

25   started negotiating?

Frederick Anthony v. Edward Walsh, et al.          FREDERICK ANTHONY November 28, 2007

Page 30

1        A    Correct.

2        Q    Okay.  And how long was that meeting?

3        A    Yeah.  I think, actually, the interview was

4    like in August, I think.

5        Q    Okay.

6        A    I'm not sure what the date was.

7        Q    A Saturday in August?

8        A    Yeah.  I'm not quite sure.

9        Q    And were you still employed at Santa Fe

10   Gaming at that time?

11       A    No.  At that time, I was working with my

12   consulting company.

13       Q    Okay.

14       A    I was a contractor on a project, a number

15   of projects.

16       Q    Okay.  Back to the meeting in August.  You

17   met with all three of them.  What do you recall about

18   that meeting?

19       A    What specifically are you looking for?

20       Q    I'd like to go over everything that you

21   remember about the meeting, whether it be how they

22   described the job or whether they indicated when they

23   would be hiring, who spoke, who didn't speak, everything

24   you can recall about the meeting.

25       A    Everything?  Primarily, Ed and -- Ed had a

a4ff1021-a17b-4f89-8edf-0b4a921ce12a

Frederick Anthony v. Edward Walsh, et al.          FREDERICK ANTHONY November 28, 2007

Page 31

1   number of questions that he asked me about certain

2   things.  He had a list of questions that I responded to.

3            We talked about marketing.  They told me

4   about the casino operation and how it was such a

5   disaster.

6        Q   And when they explained to you that it was

7   a disaster, did they explain what aspect was a disaster?

8        A   Yeah.  The -- they thought that there might

9   be some issues with the fundamental business plan.  They

10   had a problem with the general manager and they

11   dismissed him.

12            What else did they talk about?  Let's see.

13   They asked about how they might improve the marketing,

14   and in general, we talked conceptually about different

15   ways you might improve marketing.

16            They talked about not having any reports

17   coming out of the property.  They were kind of in the

18   dark on everything.

19            They talked about the gaming commission

20   fining them for some problems that they had.  They

21   talked about the number of days that -- part of their

22   fine was they had to close down the casino in order to

23   do some training with the cage people and the drop

24   people because of irregularities and not complying with

25   certain gaming requirements.

Local          Pelton Reporting Service, Inc.          Denver
(719) 578-2062 peltonreporting@comcast.net (303) 575-6606

a4ff1021-a17b-4f89-8edf-0b4a921ce12a

Page 35

1          Q   Okay.  When was the next contact you had

2   with any of the defendants or any agent of the

3   defendants?

4          A   As a result of the interview, Ed directed

5   Gary and Mike and I to negotiate our deal.

6          Q   And how do you know that Ed directed --

7          A   He specifically stated that.

8          Q   Did he call you?

9          A   No.  We were in the interview.  Towards the

10   end of the interview, I asked what the next step is.

11   And he said, You'll -- you'll work with Mike and Gary,

12   you know, if you're the candidate.

13          Q   Okay.

14          A   Because he was going to be tied up in some

15   big legal deal, that he was going to kind of sequester

16   himself and just pour himself into the deal.

17          Q   Okay.

18          A   Yeah.

19          Q   All right.  And so during the Saturday, the

20   August Saturday meeting -- did you have any other

21   meetings in August with any of the defendants or their

22   agents?

23          A   Not in August.  The week of -- the week of

24   Labor Day -- as a result of the interview, I stated that

25   I would like to go see the property so that I have some

Page 36

1    familiarity with it, and they said, Okay, we'll arrange

2    for that.

3          Q    Okay.

4          A    And we made arrangements to visit the

5    property the first week in September.  It was around

6    Labor Day.  And I met with another one of the owners,

7    Joe Rivera, and spent, like, two days there.

8          Q    Had you been offered the position by the

9    time you traveled there to visit the casino?

10         A    No.

11         Q    Okay.

12         A    No.  I was asked to go and look at the

13   property.

14         Q    Okay.

15         A    I requested to look at the property.

16         Q    Okay.

17         A    And they acknowledged that and said, Sure.

18         Q    Okay.  Did they pick up the tab for your

19   travel?

20         A    Yeah, they paid for the travel expense.

21         Q    Okay.  So you spent, I'm sorry, two days

22   there?

23         A    Yeah.  I think it was like a day and a

24   half, two days, yeah.

25         Q    And the casino was operational at that

Local         Pelton Reporting Service, Inc.        Denver
(719) 578-2062 peltonreporting@comcast.net (303) 575-6606
a4ff1021-a17b-4f89-8edf-0b4a921ce12a

Frederick Anthony v. Edward Walsh, et al.                    FREDERICK ANTHONY November 28, 2007

                                                                              Page 37

1    time?

2              A    It was.

3              Q    Okay.  And it was called Wild Horse Casino;

4    is that right?

5              A    Yes.

6              Q    And did you enter through the front, the

7    side?  How did you get into the premises when you first

8    visited, do you recall?

9              A    I don't recall.

10             Q    Okay.  There's clearly signs all over that

11   say "Wild Horse Casino," right?

12             A    Oh, certainly.

13             Q    And coasters and napkins and all kinds of

14   references to Wild Horse Casino, right?

15             A    Certainly.

16             Q    Okay.  And you understood you would be

17   working for Wild Horse Casino, right?

18             A    Wild Horse Casino and the partners.

19             Q    Okay.  Did you think you were going to be

20   employed by the partners individually?

21             A    Collectively, under Wild -- Wild Horse

22   partners.

23             Q    Okay.  For the Wild Horse --

24             A    Casino.

25             Q    Okay.  But not that you would be an

Local              Pelton Reporting Service, Inc.          Denver
(719) 578-2062 peltonreporting@comcast.net (303) 575-6606
                                                      a4ff1021-a17b-4f89-8edf-0b4a921ce12a

Frederick Anthony v. Edward Walsh, et al.                FREDERICK ANTHONY November 28, 2007

Page 38

1    employee of Ed Walsh?

2           A    Oh, no, no, no.  I understood that my

3    employment was actually in the Wild Horse Casino.

4           Q    Okay.

5           A    I would be paid through the Wild Horse

6    Casino.

7           Q    Okay, all right.  And everyone disclosed

8    that Wild Horse Casino would be paying you, correct?

9           A    Yes.  That's where my paychecks came from.

10          Q    Okay.  And do you know that the Wild Horse

11   Casino is a registered trade name for Wild Horse

12   Investment Partners?

13          A    I didn't know that at the time.  I don't

14   really know that.

15          Q    I'm handing you what's been marked as

16   Exhibit 30.  Can you tell me if you've ever seen that

17   document before today?

18          A    I -- I don't know what this is.

19          Q    So you have not seen it before today?

20          A    No, I haven't seen this.

21          Q    Okay.  Do you know that Wild Horse Casino

22   is the registered trade name of Wild Horse Investment

23   Partners?

24          A    I don't know that.

25          Q    You knew that you would be working for --

Local            Pelton Reporting Service, Inc.            Denver
(719) 578-2062 peltonreporting@comcast.net (303) 575-6606
                                              a4ff1021-a17b-4f89-8edf-0b4a921ce12a

Page 39

1   let me ask you, did you think you were going to be

2   working for Wild Horse Casino or Wild Horse Investment

3   Partners?

4          A   Wild Horse Casino.

5          Q   Okay.  All right.  So back to Labor Day.

6   You went and visited the property, and you met Joe

7   Rivera.  Did you see or speak with Ed Walsh, Mike Walsh,

8   or Gary Lev during that weekend?

9          A   No.

10          Q   Okay.  So the only agent you were talking

11   with from Wild Horse would be Joe Rivera?

12          A   Correct.

13          Q   Okay.  And did he offer you the position at

14   that time?

15          A   He did not.

16          Q   Okay.  Did he talk about the company's

17   finances at that time?

18          A   He just generally said that they've had a

19   lot of problems at the casino.  He went over some of the

20   things that were mentioned by Ed, Mike and Gary about

21   the operation:  It was a challenge.

22              You know, he said he knew nothing about

23   casinos and that he was basically the baby-sitter,

24   brought them through the construction and was on-site

25   until they could find a general manager.

a4ff1021-a17b-4f89-8edf-0b4a921ce12a

Page 43

1          A    Cell phone.

2          Q    Okay.  And do you recall the next

3    conversation you had with anyone?

4          A    The next conversation was with Mike and

5    Gary, I believe over the phone, and that was the whole

6    series of negotiations, those two; you know, what I was

7    looking for in my contract.

8          Q    Okay.  Had you -- so there was a call from

9    Gary saying, We would like to offer you a position.  And

10   then there was a subsequent call with both Mike and

11   Gary, during which you negotiated terms of your

12   employment, correct?

13         A    There were a number of calls with Mike and

14   Gary.  It was always both of them on the phone.

15         Q    Okay.  The first call with both of them,

16   had you submitted anything to them, other than the

17   application, prior to that call?

18         A    I'm not sure if Gary asked me to lay out

19   what I -- what I needed in the contract.  I'm not sure

20   how that happened, whether we talked, if they had a

21   deal -- a contract to sign or not.  There was nothing

22   mentioned of a previous manager's contract, but yet they

23   knew that I would not take the position without a

24   contract.

25         Q    And how did they know that?

a4ff1021-a17b-4f89-8edf-0b4a921ce12a

Frederick Anthony v. Edward Walsh, et al.          FREDERICK ANTHONY November 28, 2007

Page 45

1    Q   Okay.  And did they indicate that was your

2   responsibility?

3    A   No.  They just simply stated that they need

4   the casino to be profitable.

5    Q   I hand you what's been marked Exhibit 2.

6   Please take a moment, look that over, and then let me

7   know if you can tell me when this was submitted to Gary

8   Lev relative to the conversation -- the first

9   conversation you had with Mike and Gary?

10    A   Well, let's see.  The date that this was

11   sent was September 15, and that is the time that we

12   began the process of talking about what needs to go into

13   the contract, what are my requirements, and the

14   negotiations as they stepped out of that, you know.

15    Q   Okay.  So would this have been before or

16   after the first call with Mike and Gary, do you know?

17    A   When you say "the first call," which first

18   call?  Oh, the first call in discussing it?  Yeah, I

19   think we had a call and they said, Put something

20   together and tell us what you want.  And then this was a

21   follow-up to that, yeah.

22    Q   Okay.  So this -- as I understand it, you

23   met with them Saturday -- on a Saturday in August.  Your

24   next contact was with Joe Rivera at the property when

25   you visited; is that correct?

Frederick Anthony v. Edward Walsh, et al.          FREDERICK ANTHONY November 28, 2007

Page 46

1          A   Correct.

2          Q   Next contact would have been when Gary

3   alone called you, saying he wanted to offer you the

4   position, correct?

5          A   Correct.

6          Q   And then you had a conversation with Mike

7   and Gary?

8          A   Right.

9          Q   And you believe that Exhibit 2 was

10   submitted to Gary after that first conversation with

11   Mike and Gary, correct?

12          A   Correct.

13          Q   Okay.  And I see that you only sent it to

14   Gary.  Do you know why you only sent it to Gary and not

15   Mike and Gary?

16          A   Yeah.  They had some -- I think -- I don't

17   know if it's Gary or Mike or both were technologically

18   challenged.

19          Q   Okay.  Meaning they had a hard time with

20   emails?

21          A   Yeah.  They had a hard time with emails,

22   hard time with fax machines.  You know, basically they

23   knew how to use the phone.

24          Q   Okay.  And did they prefer to communicate

25   by phone?

Frederick Anthony v. Edward Walsh, et al.          FREDERICK ANTHONY November 28, 2007

Page 68

1    further on it.

2           Q    All right.  Do you recall speaking with

3    them on September 17 about this document?

4           A    Yes.

5           Q    Do you recall how long that phone

6    discussion was?

7           A    I'm guessing a half an hour.

8           Q    But you don't recall specifically?

9           A    I don't recall.

10          Q    Was it only Gary and Mike, as far as you

11   know, that were on the phone conference with you?

12          A    Yes.

13          Q    Okay.  And at the conclusion of the

14   conference, what was the plan?  Were you --

15          A    I said that I would make notes on here and

16   make another iteration for the next conversation.

17          Q    Had you accepted the position yet?

18          A    No.

19          Q    Okay.

20          A    Well, accepted the position?  I said, I'll

21   take the position subject to the contract.

22          Q    Okay.  If we can get the terms worked out,

23   I'll take the position?

24          A    Right.

25          Q    Okay.  I hand you what's been marked

Frederick Anthony v. Edward **Walsh**, et al.          FREDERICK ANTHONY November 28, 2007

Page 69

1      Exhibit 19.  I will tell you --

2              MR. RAY:  Or 5.

3              MS. WIELAND:  I'm sorry, 5.  Thank you.

4          A   Getting ahead of yourself.

5          Q   (BY MS. WIELAND)  Exhibit 5, dated

6      September 19.  I'll tell you, I'm not trying to play a

7      game, as far as I can tell, this is the next document in

8      the version of "Employment Considerations."

9              Are you aware of any other prior document

10     between Exhibit 4 and 5?

11         A   Between those two, no, I don't believe so.

12         Q   Okay.  And in the first bullet point -- in

13     all of these, it indicates at the very top, "Fred

14     Anthony & Wild Horse Casino," correct?

15         A   Uh-huh.

16         Q   And that's because you understood you would

17     be working for Wild Horse Casino, right?

18         A   Correct.

19         Q   And would be employed by Wild Horse, right?

20         A   Correct.

21         Q   And you weren't going to be employed by Ed

22     Walsh?

23         A   No.

24         Q   And he wasn't going to write you a paycheck

25     out of his personal account, right?

a4ff1021-a17b-4f89-8edf-0b4a921ce12a

Frederick Anthony v. Edward Walsh, et al.          FREDERICK ANTHONY November 28, 2007

Page 70

1          A    No.

2          Q    And you weren't going to be employed by

3    Gary Lev, correct?

4          A    No.

5          Q    And you weren't going to be employed by

6    Mike Walsh, right?

7          A    Correct.

8          Q    You knew it was -- you would be employed by

9    Wild Horse Casino or Wild Horse Investment Partners,

10   correct?

11         A    Yes.

12              MR. RAY:  Objection to the form.

13         A    Okay.

14              MR. RAY:  You can answer the question.

15         Q    (BY MS. WIELAND)  Is that accurate?

16         A    Yes.

17         Q    Looking at Exhibit 5, can you tell what

18   comments are in blue on this document?

19         A    I can't tell from here.

20         Q    Okay.  The first entry, "Annual Base

21   Salary," you've got "$150,000," and then after that,

22   "125,000."

23         A    Yeah.  I think originally -- I forget

24   where -- Gary or Mike or -- I don't know who --

25   mentioned that the salary was 125-.  I forget where that

Frederick Anthony v. Edward Walsh, et al.          FREDERICK ANTHONY November 28, 2007

Page 77

1          And certainly that's what -- what my goal

2    was, and what I did do.  And if you're familiar with the

3    industry, it's a 24/7 operation, okay?  So you're

4    working literally 24/7, no matter where you are.

5          Q    Okay.  Always something that can come up?

6          A    Always.

7          Q    Okay.  You didn't include any signatures

8    on -- signature blocks on Exhibit 6?

9          A    Yeah.  I don't know if there was another

10   page to this or not, but no, it doesn't look like it.

11         Q    Okay.  You've been handed Exhibit 7, what's

12   been marked as Exhibit 7.  You recognize this document?

13   Yes?

14         A    I'm sorry, what was your question?

15         Q    Do you recognize this document?

16         A    Yes.

17         Q    This is something you drafted?

18         A    Yes.

19         Q    And you would have forwarded it to Mike and

20   by email?

21         A    Yes.

22         Q    Have you had any conversations as of

23   February -- or, excuse me, September 21, 2004 with Ed

24   Walsh, other than that initial meeting in August?

25         A    No.

Frederick Anthony v. Edward Walsh, et al.                    FREDERICK ANTHONY November 28, 2007

Page 78

1          Q    Okay.  And still on September 21, you're

2    including the four-year term with the two three-year

3    renewal options, correct?

4          A    Correct.

5          Q    Have they rejected that at this point?

6          A    At this point, it's still an open item.

7          Q    Okay.  When did they reject it, do you

8    recall?

9          A    I don't recall.  I have to look at the

10   documents further on.

11         Q    Let's see.  You've been handed what's been

12   marked Exhibit 8.  Is this an email from you to Gary and

13   copied to Mike Walsh?

14         A    Yes, it is.

15         Q    Okay.  Why aren't you sending any of these

16   to Ed Walsh?

17         A    Because Ed instructed me, and Gary and

18   Mike, to work out our deal together, because he would

19   not be available due to this legal case that he was

20   tying himself up in.

21         Q    Okay.  And there is an attachment to the

22   email found at Exhibit 8.  Would that be the document

23   found at Exhibit 9?

24         A    Yes.

25         Q    Okay.  Do you have any idea what the red

Frederick Anthony v. Edward Walsh, et al.　　　FREDERICK ANTHONY November 28, 2007

Page 85

1　　　　A　Yeah.　32 and 11 pretty much go

2　hand-in-hand except for that, I believe.　That was the

3　only change.　And, you know, the wordsmithing of it was

4　poor.　And again, everyone was in a rush to get this

5　deal laid out, selected, be on-site within a couple

6　weeks.

7　　　　Q　Okay.　You've included signature blocks

8　identifying Michael Walsh and Gary Lev as owners, right?

9　　　　A　Right.

10　　　　Q　Okay.　And you understood them to be owners

11　of the Wild Horse Casino?

12　　　　A　Correct.

13　　　　Q　Okay.　And --

14　　　　A　And representing all of the owners.

15　　　　Q　Okay.　But you knew who all the owners

16　were?

17　　　　A　Right.

18　　　　Q　Okay.

19　　　　A　Right.

20　　　　Q　Okay.　Now, this whole arrangement is

21　contingent upon you receiving a gaming license from the

22　Colorado Division of Gaming, right?

23　　　　A　Absolutely.

24　　　　Q　Okay.　But if you didn't receive it, are

25　they still obligated to pay you four years?

Frederick Anthony v. Edward Walsh, et al.          FREDERICK ANTHONY November 28, 2007

Page 93

1   You had Jeannie, who was a controller at the time.  You

2   had Trevor Taylor, Steve Siegrist, Joe -- I forget his

3   last name; he was the surveillance manager.  The

4   executive chef was brought in, his assistant was brought

5   in.

6             Who else was there?  I think that's

7   basically it.

8             Q    Okay.  What was Trevor Taylor's position?

9             A    He was the marketing director.

10            Q    Okay.  And how soon did this meeting occur

11  after -- did you, in fact, start on October 18?

12            A    Yes, I did.

13            Q    Okay.  How soon after October 18 did this

14  meeting with the management team occur?

15            A    I think it was the next day.

16            Q    Okay.  Do you recall between September 28,

17  when you allege you had a deal with Wild Horse Casino,

18  when you next spoke with anyone from Wild Horse Casino?

19            MR. RAY:  Objection to the form.  Go ahead

20  and answer.

21            A    Specifically, anyone from the Wild Horse

22  Casino from the --

23            Q    (BY MS. WIELAND)  Yeah.  Did you have

24  conversations between September 28 and October 18?

25            A    Only logistical, to simply talk with Gary