Case No. 1:07-cv-00540-RPM-CBS   Document 26-1   filed 02/06/08   USDC Colorado   pg 1 of 8

Frederick Anthony v. Edward Walsh, et al.        FREDERICK ANTHONY November 28, 2007

Page 1

```
 1      IN THE UNITED STATES DISTRICT COURT
 2         FOR THE DISTRICT OF COLORADO
 3   Civil Action No. 07-cv-00540-RPM-CBS
 4   ------------------------------------
 5   DEPOSITION OF FREDERICK M. ANTHONY
 6   ------------------------------------
 7   FREDERICK M. ANTHONY,
 8              Plaintiff,
 9   vs.
10   EDWARD J. WALSH,
     GARY LEV,
11   MICHAEL WALSH,
     WILD HORSE INVESTMENT PARTNERS, LLC, a Colorado limited
12   liability company,
13              Defendants.
14   ------------------------------------
15        Wednesday, November 28, 2007
16             9:23 a.m.
17
18   PURSUANT TO Notice and the Federal Rules of Civil
     Procedure, the above-entitled deposition was taken on
19   behalf of Defendants at 370 17th Street, Suite 4650,
     Denver, Colorado, before K. Michelle Dittmer, Registered
20   Merit Reporter and Notary Public within Colorado.
21
22
23
24
25
```

Page 2

```
 1
 2   APPEARANCES:
 3   For the Plaintiff:
         KEITH P. RAY, ESQ.
 4       Lathrop & Gage, LC
         370 17th Street, Suite 4650
 5       Denver, Colorado 80202-5607
 6   For the Defendants:
         HOLLIE L. WIELAND, ESQ.
 7       Sears & Swanson, P.C.
         2 North Cascade Avenue, Suite 1250
 8       Colorado Springs, Colorado 80903
```

EXHIBIT 1

Page 3

```
 1                  INDEX
 2   EXAMINATION                         PAGE
 3   November 28, 2007
 4
 5   By Ms. Wieland                         6
 6   By Mr. Ray                            --
 7
 8   EXHIBITS                    INITIAL REFERENCE
 9
     1  Plaintiff Frederick Anthony's Responses    80
10      to First Set of Interrogatories and
        Request for Production of Documents
11
     2  9/15/04 Email to Gary Lev from Fred Anthony  45
12      FA000001
13   3  9/17/04 Email to Ed Walsh from Fred Anthony  50
        FA000002
14
     4  9/17/04 "Employment Considerations"        49
15      FA000003-4
16   5  9/19/04 "Employment Considerations"        69
        FA000005-6
17
     6  9/20/04 "Final Agreements on Employment    74
18      Considerations"
        FA000007-8
19
     7  9/21/04 "Final Agreements on Employment    77
20      Considerations"
        FA000009-10
21
     8  9/22/04 Email to Gary Lev from Fred Anthony  78
22      FA000011
23   9  9/22/04 "Final Agreements on Employment    78
        Considerations"
24      FA000012-13
25
```

Page 4

```
 1   EXHIBITS (Continued)          INITIAL REFERENCE
 2   10 9/24/04 "Final Proposal on Employment       79
        Considerations"
 3      FA000014-15
 4   11 9/28/04 "Letter of Intent and Employee      80
        Agreement"
 5      FA000016-17
 6   12 "Copied from Ed Walsh's email"             173
        2/14/06 Email to Fred Anthony from Ed Walsh
 7      FA000018
 8   13 "Copied from Ed Walsh's email"             181
        2/15/06 Email to Fred Anthony from Ed
 9      Walsh with attachments
        FA000019-23
10
     14 US Bankruptcy Court Voluntary Petition     148
11      Schedule B Personal Property,
        Schedule G Executory Contract and
12      Unexpired Leases, Schedule F Creditors
        Holding Unsecured Nonpriority Claims,
13      Form 4 List of Creditors Holding 20
        Largest Unsecured Claims
14      FA000030-35
15   15 2002 1040 Tax Return                       229
        FA000036
16
     16 2002 Schedule C Profit or Loss From Business  229
17      FA000037
18   17 2003 Form 1040X Amended US Individual Income 230
        Tax Return
19      FA000038
20   18 2003 Schedule C Profit or Loss From Business  230
        FA000039
21
     19 2004 Form 1040                             231
22      FA000040
23   20 2004 Schedule C Profit or Loss From Business 231
        FA000041
24
     21 2005 Form 1040X Amended US Individual Income 232
25      Tax Return
```

1

Frederick Anthony v. Edward Walsh, et al.        FREDERICK ANTHONY November 28, 2007

Page 25

1   A  No.
2   Q  Okay. Does Exhibit 28 accurately reflect
3   your work experience?
4   A  It does as it relates to gaming.
5   Q  Is it inaccurate in some manner?
6   A  Pardon me?
7   Q  Is it inaccurate in some manner?
8   A  No. Again, I simply reference the fact
9   that it was related to gaming, and I provided my
10  references as they relate to gaming.
11  Q  Prior to working at Wild Horse Casino, had
12  you been a general manager at any casino?
13  A  A general manager? Yeah, at the Silverton.
14  Q  Okay. And you were a general manager of
15  the casino?
16  A  Yes.
17  Q  Okay.
18  A  I ran everything at that casino.
19  Q  Okay.
20  A  The gaming, as well as -- all operations, I
21  ran.
22  Q  Okay. When did you graduate from Miami --
23  1972; is that correct?
24  A  Uh-huh.
25  Q  Okay, all right. Do you recall how you

Page 26

1   first met Mike Walsh?
2   A  Yes.
3   Q  Please tell me.
4   A  In the -- in his bedroom at the Mandalay
5   Bay.
6   Q  How did you two meet? Did you -- were you
7   responding to a job offer -- or a job posting? Did you
8   meet in the casino? Were you friends?
9   A  How did we come to meet? I mean, I'm not
10  sure that I understand how we came to meet. I was there
11  for an interview.
12  Q  Okay. And that's exactly --
13  A  Okay.
14  Q  -- what I mean.
15  A  Yeah.
16  Q  How did you come to learn that there was an
17  opening?
18  A  At the Wild Horse?
19  Q  Yes.
20  A  Through a friend of mine, Stan Banks.
21  Q  Okay. Stan Banks informed you that the
22  Wild Horse was hiring?
23  A  That is correct.
24  Q  What do you recall about what Stan Banks
25  told you about the position or the opening?

Page 27

1   A  He simply said that they're looking to
2   replace the general manager that they just fired, would
3   I be interested in it, and if so, he gave me the
4   information to contact Ed Walsh.
5      Actually, it wasn't Ed Walsh, it was
6   another guy who was -- there's a fellow by the name of
7   Don something, who was working for Ed, trying to find
8   candidates for that position.
9   Q  Okay. Do you remember what time period
10  this was that you would have tendered a -- did you send
11  in this resume, Exhibit 28, to someone?
12  A  Yeah. I emailed it to Don.
13  Q  Okay.
14  A  And that would have been, timewise, around
15  the end of June, beginning of July.
16  Q  Okay.
17  A  Of '04.
18  Q  Okay. And do you recall what the response
19  was to your submission of the resume?
20  A  I was asked to interview with Ed, Mike, and
21  Gary in Las Vegas.
22  Q  Do you recall how long between the
23  submission of the resume and the time you were asked for
24  an interview, how long that was?
25  A  I don't recall. It was three or four weeks

Page 28

1   maybe.
2   Q  Okay. And so you were asked to interview
3   with them. Do you recall when you first interviewed
4   with any of them?
5   A  The date?
6   Q  The date or the circumstances.
7   A  The only thing I recall is meeting with
8   them. It was on a Saturday.
9   Q  It was on a Saturday?
10  A  Yeah.
11  Q  And it was in Las Vegas?
12  A  Correct.
13  Q  At the Mandalay Bay?
14  A  Yeah. It started out at the Howard
15  Johnson's, which was a decrepit little place, and Ed was
16  embarrassed by it.
17  Q  Is that where someone was staying?
18  A  No. I think they flew in to meet there. I
19  don't know who was staying there, I don't know who would
20  want to stay there, but --
21  Q  Okay.
22  A  Anyway, I said, Oh, okay, that's where
23  you're going to meet.
24     So I went down there and I met with Ed and
25  he said -- you know, we met in the parking lot and he

7

Page 29

1  said, You know, this place is really kind of nasty. He
2  said, Let's go to Mandalay Bay.
3       So we drove in my car, both Gary and Ed and
4  I, to Mandalay Bay.
5    Q  Okay. You, Gary and Ed were the only ones
6  in the car?
7    A  Correct.
8    Q  Did you meet anyone else at Mandalay Bay?
9    A  Mike.
10   Q  Okay. And did you go to someone's room?
11 You mentioned you first met Mike in a hotel room, and
12 I'm just trying to --
13   A  We went to Mike's room.
14   Q  Okay.
15   A  It was the only available place to have the
16 interview.
17   Q  Okay. And that was the first time you met
18 him?
19   A  Correct, first time for meeting all of
20 them.
21   Q  That all occurred on the same day?
22   A  Correct.
23   Q  And it would have been June or July when
24 you submitted your resume, and September 14 when you
25 started negotiating?

Page 30

1    A  Correct.
2    Q  Okay. And how long was that meeting?
3    A  Yeah. I think, actually, the interview was
4  like in August, I think.
5    Q  Okay.
6    A  I'm not sure what the date was.
7    Q  A Saturday in August?
8    A  Yeah. I'm not quite sure.
9    Q  And were you still employed at Santa Fe
10 Gaming at that time?
11   A  No. At that time, I was working with my
12 consulting company.
13   Q  Okay.
14   A  I was a contractor on a project, a number
15 of projects.
16   Q  Okay. Back to the meeting in August. You
17 met with all three of them. What do you recall about
18 that meeting?
19   A  What specifically are you looking for?
20   Q  I'd like to go over everything that you
21 remember about the meeting, whether it be how they
22 described the job or whether they indicated when they
23 would be hiring, who spoke, who didn't speak, everything
24 you can recall about the meeting.
25   A  Everything? Primarily, Ed and -- Ed had a

Page 31

1  number of questions that he asked me about certain
2  things. He had a list of questions that I responded to.
3       We talked about marketing. They told me
4  about the casino operation and how it was such a
5  disaster.
6    Q  And when they explained to you that it was
7  a disaster, did they explain what aspect was a disaster?
8    A  Yeah. The -- they thought that there might
9  be some issues with the fundamental business plan. They
10 had a problem with the general manager and they
11 dismissed him.
12       What else did they talk about? Let's see.
13 They asked about how they might improve the marketing,
14 and in general, we talked conceptually about different
15 ways you might improve marketing.
16       They talked about not having any reports
17 coming out of the property. They were kind of in the
18 dark on everything.
19       They talked about the gaming commission
20 fining them for some problems that they had. They
21 talked about the number of days that -- part of their
22 fine was they had to close down the casino in order to
23 do some training with the cage people and the drop
24 people because of irregularities and not complying with
25 certain gaming requirements.

Page 32

1    Q  Okay. Do you recall other topics?
2    A  General topics about family, just like you
3  asked, you know: Are you married? Wife? Kid? How --
4    Q  They asked you about your family?
5    A  They asked me about my family.
6    Q  Did they talk about their families?
7    A  No.
8    Q  Okay. Other topics you recall discussing?
9    A  They talked about they needed to move as
10 quickly as possible to get a general manager in there.
11   Q  They disclosed that it was a general
12 manager position; is that correct?
13   A  That's correct.
14   Q  Okay. And did they discuss any of the
15 expectations for the position: schedule, hours, whether
16 they expected someone to move to Cripple Creek?
17   A  They asked me if I would relocate to
18 Cripple Creek, and I said yes.
19   Q  Okay. Did they propose a schedule?
20   A  No.
21   Q  Did they talk about pay rate?
22   A  We -- we talked about pay -- no. We talked
23 about pay when Gary and Mike and I were negotiating.
24   Q  Okay. And I want to focus on this first
25 meeting.

Frederick Anthony v. Edward Walsh, et al.                    FREDERICK ANTHONY November 28, 2007

Page 33

1     A   Okay.
2     Q   Prior to this first meeting on a Saturday
3  in August, had you spoken on the phone with Gary Lev,
4  Mike Walsh or Ed Walsh?
5     A   No, I don't believe so.
6     Q   You think someone else set up the
7  interview?
8     A   Yeah. It was set up through this fellow
9  Don.
10    Q   Okay.
11    A   He was a retired guy that Ed knew that was
12 in the hospitality business, and he was coordinating
13 pulling candidates together. So that's all I knew about
14 him.
15    Q   Okay. So the first time you spoke with any
16 of them, any of the defendants, was -- and when I refer
17 to the "defendants," I'm referring to Gary Lev, Mike
18 Walsh and Ed Walsh, and to the extent I refer to the
19 defendants throughout the rest of this deposition, will
20 you understand I'm referring to those individuals?
21    A   Yeah. That was the first time I met those
22 people.
23    Q   Okay.
24    A   I was invited by them for the interview.
25    Q   Okay. Did you understand that they were

Page 34

1  interviewing other people?
2     A   Yes.
3     Q   Okay. Did they mention a timeframe, any
4  other interviews, when they might be making a decision?
5     A   They had another interview scheduled that
6  afternoon. I think they were interviewing three people,
7  I thought. They thought that it would be a week or two
8  before they finished the process of interviewing, and
9  then they would call back whoever they felt the
10 candidate was.
11    Q   Okay. In your lawsuit, you have asserted
12 two claims. One is for breach of contract, and one is
13 for promissory estoppel. Do you know that?
14    A   Correct.
15    Q   Okay.
16    A   Yes.
17    Q   In your promissory estoppel claim, you have
18 alleged that the defendants made representations to you
19 which induced your reliance and made you move and accept
20 the position, correct?
21    A   Correct.
22    Q   During the August -- the Saturday meeting
23 in August, were there any representations made which
24 induced you to accept the position or move to Colorado?
25    A   At that point, no.

Page 35

1     Q   Okay. When was the next contact you had
2  with any of the defendants or any agent of the
3  defendants?
4     A   As a result of the interview, Ed directed
5  Gary and Mike and I to negotiate our deal.
6     Q   And how do you know that Ed directed --
7     A   He specifically stated that.
8     Q   Did he call you?
9     A   No. We were in the interview. Towards the
10 end of the interview, I asked what the next step is.
11 And he said, You'll -- you'll work with Mike and Gary,
12 you know, if you're the candidate.
13    Q   Okay.
14    A   Because he was going to be tied up in some
15 big legal deal, that he was going to kind of sequester
16 himself and just pour himself into the deal.
17    Q   Okay.
18    A   Yeah.
19    Q   All right. And so during the Saturday, the
20 August Saturday meeting -- did you have any other
21 meetings in August with any of the defendants or their
22 agents?
23    A   Not in August. The week of -- the week of
24 Labor Day -- as a result of the interview, I stated that
25 I would like to go see the property so that I have some

Page 36

1  familiarity with it, and they said, Okay, we'll arrange
2  for that.
3     Q   Okay.
4     A   And we made arrangements to visit the
5  property the first week in September. It was around
6  Labor Day. And I met with another one of the owners,
7  Joe Rivera, and spent, like, two days there.
8     Q   Had you been offered the position by the
9  time you traveled there to visit the casino?
10    A   No.
11    Q   Okay.
12    A   No. I was asked to go and look at the
13 property.
14    Q   Okay.
15    A   I requested to look at the property.
16    Q   Okay.
17    A   And they acknowledged that and said, Sure.
18    Q   Okay. Did they pick up the tab for your
19 travel?
20    A   Yeah, they paid for the travel expense.
21    Q   Okay. So you spent, I'm sorry, two days
22 there?
23    A   Yeah. I think it was like a day and a
24 half, two days, yeah.
25    Q   And the casino was operational at that

9

Frederick Anthony v. Edward Walsh, et al.   FREDERICK ANTHONY November 28, 2007

Page 37

1  time?
2  A  It was.
3  Q  Okay.  And it was called Wild Horse Casino;
4  is that right?
5  A  Yes.
6  Q  And did you enter through the front, the
7  side?  How did you get into the premises when you first
8  visited, do you recall?
9  A  I don't recall.
10  Q  Okay.  There's clearly signs all over that
11  say "Wild Horse Casino," right?
12  A  Oh, certainly.
13  Q  And coasters and napkins and all kinds of
14  references to Wild Horse Casino, right?
15  A  Certainly.
16  Q  Okay.  And you understood you would be
17  working for Wild Horse Casino, right?
18  A  Wild Horse Casino and the partners.
19  Q  Okay.  Did you think you were going to be
20  employed by the partners individually?
21  A  Collectively, under Wild -- Wild Horse
22  partners.
23  Q  Okay.  For the Wild Horse --
24  A  Casino.
25  Q  Okay.  But not that you would be an

Page 38

1  employee of Ed Walsh?
2  A  Oh, no, no, no.  I understood that my
3  employment was actually in the Wild Horse Casino.
4  Q  Okay.
5  A  I would be paid through the Wild Horse
6  Casino.
7  Q  Okay, all right.  And everyone disclosed
8  that Wild Horse Casino would be paying you, correct?
9  A  Yes.  That's where my paychecks came from.
10  Q  Okay.  And do you know that the Wild Horse
11  Casino is a registered trade name for Wild Horse
12  Investment Partners?
13  A  I didn't know that at the time.  I don't
14  really know that.
15  Q  I'm handing you what's been marked as
16  Exhibit 30.  Can you tell me if you've ever seen that
17  document before today?
18  A  I -- I don't know what this is.
19  Q  So you have not seen it before today?
20  A  No, I haven't seen this.
21  Q  Okay.  Do you know that Wild Horse Casino
22  is the registered trade name of Wild Horse Investment
23  Partners?
24  A  I don't know that.
25  Q  You knew that you would be working for --

Page 39

1  let me ask you, did you think you were going to be
2  working for Wild Horse Casino or Wild Horse Investment
3  Partners?
4  A  Wild Horse Casino.
5  Q  Okay.  All right.  So back to Labor Day.
6  You went and visited the property, and you met Joe
7  Rivera.  Did you see or speak with Ed Walsh, Mike Walsh,
8  or Gary Lev during that weekend?
9  A  No.
10  Q  Okay.  So the only agent you were talking
11  with from Wild Horse would be Joe Rivera?
12  A  Correct.
13  Q  Okay.  And did he offer you the position at
14  that time?
15  A  He did not.
16  Q  Okay.  Did he talk about the company's
17  finances at that time?
18  A  He just generally said that they've had a
19  lot of problems at the casino.  He went over some of the
20  things that were mentioned by Ed, Mike and Gary about
21  the operation:  It was a challenge.
22     You know, he said he knew nothing about
23  casinos and that he was basically the baby-sitter,
24  brought them through the construction and was on-site
25  until they could find a general manager.

Page 40

1  Q  Okay.  During that first meeting in August,
2  was it disclosed that the casino was struggling
3  financially?
4  A  They didn't say it was struggling
5  financially.  They said they had a very rough opening.
6  Q  Okay.
7  A  And that they have a number of operational
8  issues with, again, complying with the gaming division
9  requirements and that's why they were fined.
10  Q  Okay.  Did you learn more about the gaming
11  commission's fine after being -- at any time after the
12  August meeting, why they were fined?
13  A  Yes, I did.
14  Q  Can you tell me why they were fined?
15  A  I only know generally --
16  Q  Okay.
17  A  -- why they were fined.  I did meet with
18  the agent in charge of the Cripple Creek office for the
19  Division of Gaming.
20  Q  Okay.
21  A  And he told me some of the problems that
22  they had had with the casino in terms of compliance and
23  why they were fined.
24     There were some irregularities in the cage,
25  it didn't balance and there were some issues with that,

10

Local
(719) 578-2062

Pelton Reporting Service, Inc.
peltonreporting@comcast.net

Denver
(303) 575-6606

Page 41

1 and there was also some issues with the drop team.
2   Q   The drop team?
3   A   The drop team.
4   Q   What's the drop team?
5   A   The drop team are the people that go to the
6 bill validators at night when the casino closes and they
7 actually drop all of the money into buckets, and then it
8 goes into a count room and it's accounted for.
9   Q   Okay. And were there allegations that
10 money had been stolen or --
11   A   No, no.
12   Q   Okay. Just inappropriately handled or
13 accounted for?
14   A   It was just sloppy. It's a sloppy
15 operation. There was some paperwork errors, nothing
16 added up. You know, they added things -- stacks of
17 money up one way, somebody adds another way and it's a
18 different amount. It was just sloppy.
19   Q   Okay. Are you aware of anyone losing their
20 license over those issues?
21   A   No, no one -- I don't believe anyone lost a
22 license over it.
23   Q   All right. After the Labor Day visit, when
24 was the next time you had contact with Wild Horse
25 Investment Partners or any of its agents?

Page 42

1   A   Shortly after that, I received a call
2 saying that they would like to offer me the position. I
3 think Gary called me.
4   Q   And offered you the position?
5   A   Uh-huh, said that he would like to hire me
6 for the position of general manager.
7   Q   What else do you recall about that
8 conversation?
9   A   He said that he and Mike would be available
10 to work out the details of the contract.
11   Q   Okay. Did he reference a contract or --
12 specifically?
13   A   Specifically.
14   Q   Okay. Work out the deals of a contract?
15   A   Right.
16   Q   Okay. And did he mention that the casino
17 had a contract it had used for a prior general manager?
18   A   No.
19   Q   Okay. And how long did that conversation
20 last?
21   A   I don't know. Ten minutes.
22   Q   Okay. Do you recall where you were when
23 you --
24   A   No.
25   Q   -- took the call?

Page 43

1   A   Cell phone.
2   Q   Okay. And do you recall the next
3 conversation you had with anyone?
4   A   The next conversation was with Mike and
5 Gary, I believe over the phone, and that was the whole
6 series of negotiations, those two; you know, what I was
7 looking for in my contract.
8   Q   Okay. Had you -- so there was a call from
9 Gary saying, We would like to offer you a position. And
10 then there was a subsequent call with both Mike and
11 Gary, during which you negotiated terms of your
12 employment, correct?
13   A   There were a number of calls with Mike and
14 Gary. It was always both of them on the phone.
15   Q   Okay. The first call with both of them,
16 had you submitted anything to them, other than the
17 application, prior to that call?
18   A   I'm not sure if Gary asked me to lay out
19 what I -- what I needed in the contract. I'm not sure
20 how that happened, whether we talked, if they had a
21 deal -- a contract to sign or not. There was nothing
22 mentioned of a previous manager's contract, but yet they
23 knew that I would not take the position without a
24 contract.
25   Q   And how did they know that?

Page 44

1   A   Because it was stated in the interview.
2 That was one of the items that was discussed in the
3 interview.
4   Q   By whom?
5   A   By myself, Ed, Mike and Gary.
6   Q   Ed, Mike and Gary said they wanted a
7 contract?
8   A   I said that I want a contract, and they
9 said they understood that, and that I would not take the
10 position without a contract.
11   Q   Okay, all right. And did they, during the
12 interview, reference any other contract they had used
13 before?
14   A   No, not at that time.
15   Q   Did they reference any of the performance
16 measures that they would want included in the contract?
17   A   None.
18   Q   Did they reference any of the obligations
19 that you were expected to meet or that would be
20 referenced in the contract?
21   A   They just simply wanted the casino to be
22 profitable.
23   Q   They said they wanted the casino to be
24 profitable?
25   A   Yeah.

11

Frederick Anthony v. Edward Walsh, et al.        FREDERICK ANTHONY November 28, 2007

Page 77

1    And certainly that's what — what my goal
2 was, and what I did do. And if you're familiar with the
3 industry, it's a 24/7 operation, okay? So you're
4 working literally 24/7, no matter where you are.
5    Q  Okay. Always something that can come up?
6    A  Always.
7    Q  Okay. You didn't include any signatures
8 on -- signature blocks on Exhibit 6?
9    A  Yeah. I don't know if there was another
10 page to this or not, but no, it doesn't look like it.
11    Q  Okay. You've been handed Exhibit 7, what's
12 been marked as Exhibit 7. You recognize this document?
13 Yes?
14    A  I'm sorry, what was your question?
15    Q  Do you recognize this document?
16    A  Yes.
17    Q  This is something you drafted?
18    A  Yes.
19    Q  And you would have forwarded it to Mike and
20 by email?
21    A  Yes.
22    Q  Have you had any conversations as of
23 February -- or, excuse me, September 21, 2004 with Ed
24 Walsh, other than that initial meeting in August?
25    A  No.

Page 78

1    Q  Okay. And still on September 21, you're
2 including the four-year term with the two three-year
3 renewal options, correct?
4    A  Correct.
5    Q  Have they rejected that at this point?
6    A  At this point, it's still an open item.
7    Q  Okay. When did they reject it, do you
8 recall?
9    A  I don't recall. I have to look at the
10 documents further on.
11    Q  Let's see. You've been handed what's been
12 marked Exhibit 8. Is this an email from you to Gary and
13 copied to Mike Walsh?
14    A  Yes, it is.
15    Q  Okay. Why aren't you sending any of these
16 to Ed Walsh?
17    A  Because Ed instructed me, and Gary and
18 Mike, to work out our deal together, because he would
19 not be available due to this legal case that he was
20 tying himself up in.
21    Q  Okay. And there is an attachment to the
22 email found at Exhibit 8. Would that be the document
23 found at Exhibit 9?
24    A  Yes.
25    Q  Okay. Do you have any idea what the red

Page 79

1 language is?
2    A  I don't, looking at this document. I'd
3 have to look at the original. That would be
4 color-coded.
5       MS. WIELAND: Can we go off the record.
6       (Discussion off the record.)
7    Q  (BY MS. WIELAND) I'm sorry, you believe
8 that Exhibit 9 is the attachment to Exhibit 8; is that
9 accurate?
10    A  Yes, ma'am.
11    Q  Okay. And you drafted that from input from
12 Mike and Gary; is that accurate?
13    A  Mike and Gary, yes.
14    Q  Okay. You've been handed what's been
15 marked Exhibit 10. Is this something you drafted?
16    A  Yes.
17    Q  You still reference a contract term of four
18 years -- "four three years and is assumable." What does
19 that mean?
20    A  Assumable -- and the reason I put that in
21 there is that if -- if the hotel/casino was sold -- and,
22 again, what might have prompted that was some discussion
23 with Mike and Gary about what they wanted to do at the
24 casino in the future. I don't know.
25       But typically, I don't want to be out of a

Page 80

1 job should they sell this, okay?
2    Q  Okay.
3    A  So if someone comes in, the word here is
4 simply that they would assume my contract, that they
5 would either buy it out if they didn't want me -- the
6 new owners --
7    Q  Right.
8    A  -- or let me work to the conclusion of it.
9    Q  And you believe that this would be binding
10 on a subsequent -- subsequent purchaser, and that
11 subsequent purchaser of Wild Horse would be obligated to
12 employ you pursuant to that contract?
13    A  Right.
14    Q  Okay. Did you consult with a lawyer -- and
15 I don't want to know any communications you had with a
16 lawyer. I just want to know whether you were consulting
17 with a lawyer during the September 2004 timeframe?
18    A  No.
19    Q  Okay. You're being handed what's been
20 marked Exhibit 11. Is this a document you drafted?
21    A  Yes.
22    Q  You're also being handed what's been marked
23 Exhibit 1, and I will refer you to page 2 of Exhibit 1.
24 And Exhibit 1 is your responses -- I'm sorry, go back to
25 the first page of Exhibit 1. Do you recognize this

20

**Page 93**

1  You had Jeannie, who was a controller at the time. You
2  had Trevor Taylor, Steve Siegrist, Joe -- I forget his
3  last name; he was the surveillance manager. The
4  executive chef was brought in, his assistant was brought
5  in.
6      Who else was there? I think that's
7  basically it.
8      Q  Okay. What was Trevor Taylor's position?
9      A  He was the marketing director.
10     Q  Okay. And how soon did this meeting occur
11 after -- did you, in fact, start on October 18?
12     A  Yes, I did.
13     Q  Okay. How soon after October 18 did this
14 meeting with the management team occur?
15     A  I think it was the next day.
16     Q  Okay. Do you recall between September 28,
17 when you allege you had a deal with Wild Horse Casino,
18 when you next spoke with anyone from Wild Horse Casino?
19     MR. RAY: Objection to the form. Go ahead
20 and answer.
21     A  Specifically, anyone from the Wild Horse
22 Casino from the --
23     Q  (BY MS. WIELAND) Yeah. Did you have
24 conversations between September 28 and October 18?
25     A  Only logistical, to simply talk with Gary

**Page 94**

1  and Joe about coordinating getting from the airport to
2  the casino for my start date.
3      Q  Okay. And would -- was it more than one
4  conversation, do you recall?
5      A  I think Gary called me first and told me to
6  coordinate with Joe and to give Joe a call, gave me his
7  cell phone number, and I called him and we coordinated
8  meeting.
9      Q  Okay. Did Wild Horse buy your airline
10 ticket out or --
11     A  Yes, they did.
12     Q  Okay.
13     A  Well, no. I bought the ticket. They
14 reimbursed me.
15     Q  Okay.
16     A  Yeah.
17     Q  All right. And so do you recall if you
18 showed up in Cripple Creek on October 18th, on the 17th,
19 what did you do?
20     A  I got there the night before, the 17th, I
21 believe.
22     Q  Okay. And were you prepared to move to
23 Cripple Creek at that time? Were you just showing up --
24     A  I was starting the process.
25     Q  Okay.

**Page 95**

1      A  I had started the process.
2      Q  Okay. Between September 28 and October 18,
3  did you go to Cripple Creek? I'm sorry, you showed up
4  on the 17th.
5      Between the 28th and the 17th, did you
6  travel to Cripple Creek?
7      A  No.
8      Q  Okay. So the first time you arrived in
9  Cripple Creek would have been the 17th, other than your
10 visit in Labor Day, I --
11     A  Correct.
12     Q  Okay. You said you gave up some other
13 work. Let's talk about that work. You were performing
14 that as a consultant; is that --
15     A  I was a consultant, yeah, in my company,
16 yeah.
17     Q  In the Anthony & Associates?
18     A  Anthony & Associates, yes.
19     Q  Okay. And to whom were you providing
20 consulting services?
21     A  Let's see. At the time, I was working on a
22 project for the Reliability Management Group;
23 specifically working at one of their clients, by the
24 name of Engelhard, Engelhard, h-a-r-d, Manufacturing,
25 and that was in Huntsville, Alabama.

**Page 96**

1      Q  Okay. And what were you doing for
2  Engelhard?
3      A  I was implementing work management process
4  changes.
5      Q  How were you paid for that work, on an
6  hourly basis, a salary basis?
7      A  Salary.
8      Q  Do you recall --
9      A  A fee base -- let's put it this way, a fee
10 basis.
11     Q  Okay. How was the fee determined?
12     A  I gave the Reliability Management Group a
13 fee for my services.
14     Q  Is it a flat fee per project or a bid for
15 that project?
16     A  Based on man-week's worth of work.
17     Q  Okay. And how long did you work at
18 Engelhard Manufacturing?
19     A  Let's see. The project started -- that
20 project started, I believe, in April.
21     Q  April '04?
22     A  '04.
23     Q  And was it every week since April of '04?
24 Was it --
25     A  Yeah.